UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Charles G.,

     Plaintiff,

     v.                                Civil Action No. 2:19–cv–192

Commissioner of Social Security,

     Defendant.

## OPINION AND ORDER
(Docs. 16, 17)

Plaintiff Charles G. brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  Pending before the Court are Plaintiff's motion to reverse the Commissioner's decision (Doc. 16), and the Commissioner's motion to affirm the same (Doc. 17).  For the reasons stated below, Plaintiff's motion is DENIED, the Commissioner's motion is GRANTED, and the Commissioner's decision is AFFIRMED.

## Background

Plaintiff was 50 years old on his amended alleged disability onset date of December 23, 2014.  He completed school through the eighth grade and has held various jobs, including as a farmhand, a logger, a construction worker, a lift operator at Jay Peak Ski Resort, a machine operator at a factory, and a tire changer.  During

the alleged disability period, he lived in an apartment with his fiancé, who was also seeking disability benefits. (AR 71.)[1] He has been married twice and has three adult children from his first wife but has no contact with his children. (AR 732, 832, 921.) He is also largely estranged from his father and his seven siblings, with the exception of one sister. (*Id.*)

Plaintiff's childhood was chaotic and traumatic, and he reports being sexually abused by a family member for years as a young child. (AR 49, 96, 920.) In 1996, he was convicted of sexual assault of his children, resulting in a jail sentence of approximately six years and six months and registration as a sex offender. (AR 733, 832; *see* AR 82.) Plaintiff has suffered from depression "for as long as he can remember" (AR 920), and he testified at his administrative hearing that he is unable to work because of this impairment (AR 81). Nonetheless, he did not attend mental health counseling between the time of his release from prison in approximately 2002 and December 2014, when he began treating with counselor Benjamin Welch, LICSW, LADC. (AR 82, 1056; *see* AR 920 (August 2015 treatment note from Welch, indicating Plaintiff stated he "has never been in treatment before").) Plaintiff testified that counseling with Welch calms him down (AR 81), but he still gets frustrated "real easy," especially with his fiancé; and if things do not go his way, he

---

[1] When citing to the administrative record, Plaintiff's counsel inexplicably opted to cite to the page numbers indicated in the blue headers at the top of each electronic page on CM/ECF, rather than to the page numbers indicated at the bottom of each page in the physical record. Counsel for the Commissioner followed suit. (*See* Doc. 17 at 4 n.3; Doc. 17-1 at 1 n.1.) Unfortunately, the page numbers in the physical record do not match up with those in the electronic record. The Court nonetheless has continued its practice of citing to the page numbers typed in the bottom right corner of the physical record and not to the numbers indicated in the CM/ECF system. In the future, in the interest of judicial efficiency, counsel are instructed to follow this practice as well.

"lose[s] it" (AR 85; *see* AR 84).  He stated that he thinks about suicide "a lot" (AR 84;

*see* AR 94), and the record documents a suicide attempt in 2011 or 2012 (AR 733,

832).  Plaintiff also suffers from a learning disability/borderline intellectual

functioning.  (AR 44, 733.)

In addition to his mental problems, Plaintiff has chronic obstructive

pulmonary disease (COPD), sleeping problems, hearing loss, and chronic back and

leg pain.  (AR 85, 87–89.)  In an effort to reduce his COPD symptoms, including

breathing problems when he walks up stairs or otherwise exerts himself, Plaintiff

uses inhalers during the day and a sleep apnea machine at night.  (AR 88–90.)

Though he has been cautioned to stop smoking to ameliorate his COPD symptoms, he

testified in March 2017 that he was smoking one pack of cigarettes per day.  (AR 99.)

Regarding his hearing deficiency, Plaintiff testified at the March 2017 administrative

hearing that he had new hearing aids that allowed him to "hear . . . a pin drop," but

the batteries were dead at the time of the hearing.  (AR 85.)  Plaintiff wears a brace

for his back pain (AR 97), but he had not engaged in physical therapy as of March

2017, despite recommendations by his medical providers to do so (AR 87–88, 872).

In May 2015, Plaintiff filed DIB and SSI applications, alleging that he is

unable to work due to COPD, low intelligence quotient (IQ), hearing loss, back pain,

and depression.  (AR 426.)  The applications were denied initially and upon

reconsideration, and Plaintiff timely requested an administrative hearing.  The

hearing was conducted on March 21, 2017 by Administrative Law Judge (ALJ)

Joshua Menard.  (AR 63–107.)  Plaintiff appeared and testified, and was represented

by an attorney.  Vocational Expert (VE) Christine Spaulding also testified at the

hearing.  On May 10, 2017, the ALJ issued a decision finding that Plaintiff was not

disabled under the Social Security Act at any time from his amended alleged

disability onset date through the date of the decision.  (AR 185–95.)

In an order dated June 6, 2018, the Appeals Council remanded the claim to the

ALJ, ordering further consideration of Plaintiff's residual functional capacity and

evaluation of the opinion evidence, including the opinions of treating counselor Welch

and the agency psychological consultants.  (AR 205–07.)  Accordingly, on November

15, 2018, ALJ Menard held a second hearing on Plaintiff's claim.  (AR 39–62.)

Plaintiff again appeared, with representation, and a new VE, James Soldner,

testified.  Medical expert James Claiborne, MD, also appeared and testified.  (AR

43–52.)  In relevant part, Dr. Claiborne testified that the record supports a finding

that Plaintiff has depression, but does not support diagnoses of other mental

disorders including posttraumatic stress disorder (PTSD) and learning

disability/borderline intellectual functioning.  (AR 44.)  Furthermore, Dr. Claiborne

opined that the record demonstrates Plaintiff would need to be restricted to simple,

repetitive tasks; no more than occasional changes in the work setting; and "less than

occasional" interaction with the general public.  (AR 45.)  On December 5, 2018,

ALJ Menard issued a second decision, again finding that Plaintiff was not disabled

under the Social Security Act at any time from his amended alleged disability onset

date through the date of the decision.  (AR 10–25.)  Thereafter, the Appeals Council

denied Plaintiff's request for review, rendering the ALJ's decision the final decision of

the Commissioner.  (AR 1–3.)  Having exhausted his administrative remedies,

Plaintiff filed the Complaint in this action on October 30, 2019.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in

"substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is

not so engaged, step two requires the ALJ to determine whether the claimant has a

"severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the

claimant has a severe impairment, the third step requires the ALJ to make a

determination as to whether that impairment "meets or equals" an impairment listed

in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§

404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her

impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582,

584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine

the claimant's residual functional capacity (RFC), which means the most the

claimant can still do despite his or her mental and physical limitations based on all

the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e),

404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to

consider whether the claimant's RFC precludes the performance of his or her past

relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the

ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, in his December 5, 2018 decision, ALJ Menard first determined that Plaintiff had not engaged in substantial gainful activity since his amended alleged disability onset date of December 23, 2014. (AR 12.) At step two, the ALJ found that Plaintiff had the severe impairments of hearing loss, depression, COPD, and degenerative disc disease. (AR 12–13.) Conversely, the ALJ found that Plaintiff's sleep apnea, right shoulder pain, borderline intellectual functioning/learning disorder, and PTSD were nonsevere. (AR 13–14.) At step three, the ALJ found that none of Plaintiff's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 14–16.) In determining the severity of Plaintiff's mental impairments at this step, the ALJ found that Plaintiff had moderate limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. (AR 15–16.) The ALJ explained that, in making these findings, he considered that Plaintiff reported

difficulty with his memory, following instructions, concentrating/maintaining pace, and focusing, and had problems with irritability; yet he could nonetheless handle his own personal care and hygiene, pay his bills, walk or take public transportation, do maintenance work at his apartment complex, prepare meals, do chores like cleaning, shop for groceries, and get along well with authority figures and others.  (*Id.*)

Next, the ALJ determined that Plaintiff had the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except as follows:

> [Plaintiff] is able to frequently climb ramps and stairs.  He is limited to frequent exposure to dust, odors, fumes and pulmonary irritants[,] and extreme cold.  He is limited to no more than frequent use of hearing.  He is able to perform simple, routine tasks with no more than occasional changes in a work setting.  He is limited to less than occasional interaction with the general public.

(AR 16–17.)  Given this RFC, and considering testimony from the VE, the ALJ found that Plaintiff was capable of performing his past relevant work as a "machine operator helper" as the job was actually performed by Plaintiff.  (AR 23.)  Alternatively, and again considering testimony from the VE, the ALJ determined that Plaintiff could perform other jobs existing in significant numbers in the national economy, including the jobs of fruit distributor, marker, and plastic hospital products assembler.  (AR 24–25.)  The ALJ concluded that Plaintiff had not been under a disability from his amended alleged disability onset date of December 23, 2014 through the date of the decision.  (AR 25.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical

7

or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. The substantial evidence standard is "very deferential," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise.*" *Brault*

8

*v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  Nonetheless, in its

deliberations, the court should bear in mind that the Social Security Act is "a

remedial statute to be broadly construed and liberally applied."  *Dousewicz v. Harris*,

646 F.2d 771, 773 (2d Cir. 1981).

<u>Analysis</u>

Plaintiff makes three principal arguments in support of his request for

reversal or remand of the ALJ's decision: (1) the ALJ's analysis of the medical

opinions and medical evidence is improper; (2) the ALJ's RFC determination is not

supported by substantial evidence and thus the ALJ erred in finding that Plaintiff

could do his past relevant work; and (3) the ALJ erred at step five in making the

alternative finding that there were a significant number of jobs in the national

economy that Plaintiff could perform.  (Doc. 16.)  In response, the Commissioner

argues that the ALJ "acted well within the bounds of his broad discretion," and the

ALJ's decision is supported by substantial evidence.  (Doc. 17 at 1.)

**I.      ALJ's Analysis of Medical Opinions and Evidence**

Plaintiff asserts that the ALJ should have afforded more weight to the

opinions of treating counselor Benjamin Welch and consulting occupational therapist

Mark Coleman, and less weight to the opinions of testifying psychological expert

Dr. James Claiborn.  The ALJ's evaluation of each of these medical opinions is

addressed below.

**A.      Benjamin Welch, LICSW, LADC**

Plaintiff began counseling with Welch, a licensed clinical social worker and

alcohol/drug counselor, in December 2014, seeking help with his depression and other issues.  (*See* AR 82, 1056.)  In March 2017, Welch completed a Questionnaire and Assessment of Ability to Do Work-Related Activities (Mental) regarding Plaintiff, wherein he indicated diagnoses of severe depression and mild, chronic PTSD. (AR 989–93.)  Explaining that Plaintiff had expressed suicidal ideation on "several occasions" and was unable to self-regulate his mood, Welch opined that Plaintiff had moderate restrictions in activities of daily living; marked difficulties in maintaining social functioning; and marked deficiencies of concentration, persistence, or pace. (AR 990.)  Considering Plaintiff's molestation as a child and his "chaotic upbringing," Welch opined that Plaintiff's prognosis is "fair," and that his symptoms are "chronic" and "lifelong," and "debilitating for [Plaintiff] at times."  (AR 991.)  Welch further opined that, as of July 28, 2015, Plaintiff had "[m]arked" limitations in maintaining attention/concentration and maintaining personal appearance; and "[e]xtreme" limitations in dealing with the public, functioning independently, responding appropriately to changes, dealing with work stress, behaving in an emotionally stable manner, relating predictably in social settings, and demonstrating reliability.  (AR 992–93.)  Welch concluded that Plaintiff "would not be able to maintain a 40[-hour] workweek" due to his mental limitations but could maintain a 15-hour workweek. (AR 993.)  The ALJ gave "[l]ittle weight" to these opinions, finding them to be conclusory, inconsistent with the treatment record, and unsupported by Plaintiff's own reported activities.  (AR 22–23.)

Plaintiff contends that the ALJ should have given more weight to Welch's opinions, considering that Welch had a several-year treatment relationship with Plaintiff; he was a specialist in the field; he provided a detailed assessment of Plaintiff's mental impairments; and his opinions are consistent with his own and with other treating providers' treatment notes.  (Doc. 16 at 7 (citing SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006)).)  Welch did indeed have a several-year treatment relationship with Plaintiff,[2] and he is a specialist in the field of mental health; but the ALJ properly acknowledged these facts by listing Welch's degrees, referring to Welch as "[Plaintiff's] mental health counselor," and citing the first page of Welch's completed Questionnaire which states that Welch had treated Plaintiff on a weekly or monthly basis since 2014.  (AR 22 (citing AR 989).)  In addition, the ALJ acknowledged Plaintiff's testimony at the administrative hearing that he "ha[d] been seeing Mr. Welch for about two years."  (AR 17; *see* AR 83.)  Moreover, the ALJ adequately considered the other relevant regulatory factors in evaluating Welch's opinions; and substantial evidence supports the ALJ's rationale for giving little weight to them.

First, the ALJ properly noted that Welch "is not an acceptable medical source for purposes of establishing [Plaintiff's] impairments."  (AR 23.)  As a licensed clinical social worker and a licensed alcohol and drug counselor, Welch is not considered an

---

[2] Although Plaintiff correctly points out that Welch treated Plaintiff for over three years (*see* AR 1052–56, indicating that Plaintiff attended counseling sessions with Welch from December 2014 until July 2018), the treatment did not begin until the alleged disability onset date, and Plaintiff's date last insured was only one week later, so most of Welch's treatment of Plaintiff occurred after the alleged disability period had expired.

"acceptable medical source" under the regulations.  20 C.F.R. §§ 404.1502(a), 404.1513(a), 416.913(a).[3]  Rather, he is considered an "other source."  *Id.* §§ 404.1513(d), 416.913(d).  Although the regulations require ALJs to consider the same factors in evaluating the opinions of "other sources" as are considered in evaluating the opinions of "acceptable medical sources," other source opinions do not require the same special consideration that acceptable medical source opinions require.  *See* SSR 06-03p, 2006 WL 2329939, at *2 ("Information from . . . 'other sources' cannot establish the existence of a medically determinable impairment . . . [;] there must be evidence from an 'acceptable medical source' for this purpose."); *id.* at *5 ("The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because . . . 'acceptable medical sources' are the most qualified health care professionals." (internal quotation marks omitted)); *see also Marziliano v. Sullivan*, 771 F. Supp. 69, 75 (S.D.N.Y. 1991) (noting that opinion of claimant's social worker did not command same weight as opinions of claimant's treating physician).  The Second Circuit explained: "[W]hile the ALJ is certainly free to consider the opinions of . . . 'other sources' in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician."  *Genier v. Astrue*, 298 F. App'x 105,

---

[3]  Effective March 27, 2017, 20 C.F.R. §§ 404.1513 and 416.913, as well as other regulations regarding the evaluation of medical evidence in social security disability cases, have been revised.  *See generally Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  But because Plaintiff filed his claim in May 2015, well before the new regulations went into effect, the Court reviews the ALJ's decision under the earlier regulations.

108 (2d Cir. 2008) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983)

(although the opinion of a nurse practitioner is "entitled to some extra consideration,"

"the diagnosis of a nurse practitioner should not be given the extra weight accorded a

treating physician['s opinion]")); *see Monette v. Colvin*, 654 F. App'x 516, 519 (2d Cir.

2016) (rejecting claimant's arguments and noting statement from claimant's social

worker was "not from an 'acceptable medical source'").  Here, the ALJ properly

considered the opinions of counselor Welch but reasonably afforded little weight to

them, in part because Welch was not an acceptable medical source.

Second, the ALJ properly considered the amount of evidentiary support or

explanation provided in Welch's opinions, finding that they are "rather conclusory,"

as they do not cite treatment records or other evidence to support the extreme

findings contained therein.  (AR 23.)  *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3)

("The more a medical source presents relevant evidence to support a medical opinion,

particularly medical signs and laboratory findings, the more weight we will give that

medical opinion.  The better an explanation a source provides for a medical opinion,

the more weight we will give that medical opinion.").  Although Welch did provide

several narrative explanations in support of his opinions (*see* AR 990–93), the ALJ

correctly observed that Welch did not cite to any treatment records or other evidence

in support thereof.  Also noteworthy, despite Welch's statement that Plaintiff "had a

plan" to commit suicide on "a few" occasions (AR 990), the record does not document

this.  In fact, the only suicide attempt documented in the record apparently occurred

sometime in 2011 or 2012, years before the alleged disability onset date of December

23, 2014 and before Plaintiff began counseling with Welch.  (*See* AR 733, 832.)
Furthermore, many of Welch's counseling notes record that although Plaintiff
reported suicidal ideation frequently, he did *not* have a plan to commit suicide (*see,
e.g.*, AR 1054 ("feeling suicidal" but "does not have a plan"), 1055 ("has been feeling
more suicidal but does not have a definite plan"), 1056 ("endorsed suicidal ideation
but no plan")), and other notes record that, at times, Plaintiff denied suicidal ideation
or felt less suicidal (*see, e.g.*, AR 1054, 1055, 1056; *see also* AR 939 ("no recent suicidal
thoughts")).  The ALJ also correctly commented that Welch's own treatment notes
"show mental status exam with intact short[-]term and long-term memory,
appropriate affect, logical thought, normal speech, and fair insight and judgment."
(AR 23; *see* AR 1056–57.)

Moreover, the ALJ accurately observed that Welch's opinions are "not
supported by [Plaintiff's] own reported daily routine, with ability to handle his own
personal care and hygiene, interact with others and get along well with people,
and . . . handle tasks such as cleaning, preparing meals[,] and grocery shopping."
(AR 23.)  It was proper for the ALJ to consider Plaintiff's daily activities in assessing
how supported Welch's opinions are, as the regulations provide that a claimant's
"pattern of daily living" is "an important indicator of the intensity and persistence of
[the claimant's] symptoms."  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see Rusin v.
Berryhill*, 726 F. App'x 837, 839 (2d Cir. 2018) (finding that ALJ did not err in
declining to afford controlling weight to physician's opinion in part because opinion
was inconsistent with claimant's "reported activities of daily living").  Further, the

ALJ's summary of Plaintiff's daily activities is supported by substantial evidence:
Plaintiff himself testified at the administrative hearing and stated in Function
Reports that he was able to take care of his own personal hygiene; go grocery
shopping; walk his dog; cook his own meals; clean his room; go out everyday (though
he sometimes felt dizzy and often had difficulty catching his breath); spend time with
others; and get along with family, friends, neighbors, and authority figures.  (AR
90–91, 408–13, 463–68; *see also* AR 733–35.)  Although the record demonstrates that
Plaintiff sometimes became frustrated and angry with others, particularly his fiancé,
he was largely able to interact with people to a normal degree.  The record simply
does not support Welch's opinion that Plaintiff was "[e]xtreme[ly]" limited in his
ability to deal with the public, function independently, and relate predictably in
social situations.  (AR 992.)

Third and finally, the ALJ found that Welch's opinions are "inconsistent with
the treatment records in evidence, including his own treatment notes, showing
mostly mild to moderate symptoms, and good response to depression medication."
(AR 23.)  The ALJ properly considered whether Welch's opinions are consistent with
the medical record, as the regulations provide that this is an important factor for an
ALJ to evaluate in determining the value of a medical provider's opinions.  *See*
20 C.F.R. §§ 404.1527(c)(4), 416.927(c)4) ("the more consistent an opinion is with the
record as a whole, the more weight we will give to that opinion").  Moreover,
substantial evidence supports the ALJ's finding that Welch's opinions are largely
inconsistent with the record.  For example, despite Welch's opinion that Plaintiff's

depression was so severely "debilitating" that Plaintiff "[could] not perform even simple tasks" (AR 991); the record demonstrates that Plaintiff's depression was responsive to medication, varied depending on situations occurring in Plaintiff's life, and did not prevent Plaintiff from attending social events and feeling hopeful at times. (*See, e.g.*, AR 931–32 (within a month of starting Sertraline, Plaintiff's depression improved and he felt calmer and less anxious), AR 972 (after about eight months on Sertraline, Plaintiff continued to do reasonably well), AR 973 ("[Plaintiff] feels he is doing pretty good with his mood and continues on Sertraline"; "[h]e says his mood is good unless someone really gets on his nerves"; "he feels the Sertraline is helping"), AR 1052 (on 5/15/18, Plaintiff reported he "has been doing better in regards to his PTSD symptoms"), AR 1053 (on 9/12/17, Plaintiff reported he "has been doing ok" though he "has had his ups and downs," and he "has been able to get a handle on his emotions"; on 11/6/17, Plaintiff reported he "has been trying to stay positive" and his fiancé was in counseling and "things seem to be better"; on 11/28/17, Plaintiff reported he "had a good Thanksgiving" with family; on 2/20/18, Plaintiff reported he "has been doing ok" but was finding the winter "hard for him" due to his "seasonal affect disorder"; on 4/2/18, Plaintiff reported he "is looking forward to spring" and "is feeling like a weight has been lifted off of him" because his fiancé and his family had "started to reconcile"; on 4/9/18, Plaintiff reported he "is looking forward to" a trip to see his father; on 4/24/18, Plaintiff reported he and his fiancé "have been doing better"), AR 1055 (on 7/8/15, Plaintiff reported he "had a good Fourth of July," he "went to a barbeque and it was okay," and he "did not feel too

anxious or overwhelmed"; on 8/11/15, Plaintiff reported he "has been doing okay," "is

looking forward to his birthday," and "is hopeful"; on 12/1/15, Plaintiff reported his

Thanksgiving was "okay" though he missed his family).) Certainly, the record also

demonstrates that Plaintiff suffered from persistent depression, which was addressed

in his counseling sessions with Welch. (*See* AR 1052–56.) But overall, the record

reveals that, during the relevant period, Plaintiff's depression was largely

exacerbated by situational stressors involving his relationship with his fiancé, his

housing situation, and his lack of finances.[4] (*Id*.) The ALJ accurately stated: "Mr.

Welch's treatment notes show that overall, [Plaintiff] has experienced mild to

moderate symptoms, with varying severity due to relationship and housing stress,

but that he reported feeling ok, with ability to attend social events such as a

barbeque, traveling to see his father, and enjoying Thanksgiving." (AR 23.)

## B.   James Claiborn, PhD, ABPP

Psychologist James Claiborn, PhD, ABPP, testified as a medical expert at the

November 2018 administrative hearing, in an effort to assist the ALJ in evaluating

the mental health treating source opinions, including particularly those of counselor

Welch. (AR 43–52.) In relevant part, as noted earlier, Dr. Claiborn testified that the

record establishes Plaintiff has "depression, not otherwise specified" (AR 44), and

---

[4] Treating physician Dr. Frank Meierdiercks stated in a June 2014 treatment note that Plaintiff was experiencing a "[h]igh stress level due to housing situation, lack of employment, [and lack of] finances[,] as [he] and [his] fiancé are living with her sister and there are others/multiple pets in a small apartment." (AR 832.) Dr. Meierdiercks further stated that Plaintiff was finding it "difficult to find work as [he] is a registered sex offender." (*Id*.) Noting that Plaintiff "would benefit from supportive counseling," Dr. Meierdiercks referred Plaintiff to counselor Welch and advised Plaintiff "to focus on self-care including walking, tak[ing] med[ications] as prescribed, us[ing] coping skills/supports, [and] [following up with app[ointments]." (*Id*.)

17

Plaintiff's depression is a "severe impairment" that "reasonably produce[s] symptoms" (AR 46).  (*See also* AR 51.)  On the other hand, Dr. Claiborn testified that the record does not support diagnoses for other mental disorders including PTSD or learning disability/borderline intellectual functioning.  (AR 44.)  Regarding learning disability/borderline intellectual functioning, Dr. Claiborn explained that "[t]here's no psychometric data . . . that would establish either borderline IQ or a learning disability."  (*Id.*)  Nonetheless, Dr. Claiborn stated that "[t]he record would certainly be consistent with someone who probably has borderline intellectual functioning" (*id.*), and it would be a "reasonable hypothesis" to opine that Plaintiff has borderline intellectual functioning (AR 50.)  Based on his review of the record, including Welch's opinions and treatment notes, Dr. Claiborn opined that Plaintiff is "moderately impaired" in his ability to understand and remember or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. (AR 45.)  Moreover, Dr. Claiborne opined that, given his mental limitations, Plaintiff would need to be restricted to "simple routine tasks," "no more than occasional changes in the work setting," and "less than occasional" interaction with the public but no limitation in his ability to interact with coworkers or supervisors.  (*Id.*)

The ALJ gave "great weight" to these opinions, "in light of" Dr. Claiborn's medical expertise in psychology, knowledge of social security disability regulations, and "unique position having reviewed . . . the record[]."  (AR 21.)  These were proper factors for the ALJ to consider in assessing the opinions of Dr. Claiborn, and they are supported by the record including Dr. Claiborn's Curriculum Vitae (AR 1069–74).

*See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."); *id.* §§ 404.1527(c)(6), 416.927(c)(6) ("[T]he amount of understanding of our disability programs and their evidentiary requirements that a medical source has, . . . and the extent to which a medical source is familiar with the other information in [the claimant's] case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.").  More importantly, the ALJ stated that Dr. Claiborn's opinions are "generally consistent with [Plaintiff's] treatment records, including [Plaintiff's] objective exam findings, showing mostly normal mental status exam, with intact thought process [and] short[-] and long-term memory[,] and appropriate behavior, and treatment notes reflecting no more than moderate depression symptoms."  (AR 21.)  As with his assessment of Welch's opinions, "consistency" was a proper factor for the ALJ to consider in assessing the value of Dr. Claiborn's opinions.  *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).  And, as discussed in detail above, substantial evidence supports the ALJ's finding that Dr. Claiborn's opinions are generally consistent with the record.  (*See, e.g.*, AR 931–32, 972 (treatment notes indicating Plaintiff's depression improved after taking Sertraline), AR 1053, 1055 (Welch's treatment summary indicating Plaintiff was doing "ok" and feeling hopeful at times, looked forward to visiting his father, and was able to have a good Thanksgiving and attend a Fourth of July barbecue), AR 1056 (Welch's observation that Plaintiff exhibited appropriate affect, logical thought

process, and intact short- and long-term memory).)

The ALJ further explained his rationale for affording great weight to Dr. Claiborn's opinions by stating that they are "supported by [Plaintiff's] reported daily activities," which showed "an independent daily routine, with ability to handle his own personal care, interact with his fiancé and friends, go out in public by himself, go shopping, use public transportation . . . [,] and more recently, perform[] maintenance work at the apartment complex where he lives." (AR 21.) As with Welch's opinions, it was proper for the ALJ to consider Plaintiff's "daily activities" in evaluating Dr. Claiborn's opinions. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.927(c)(3); *Zerrilla v. Comm'r of Soc. Sec.*, No. 1:11-CV-191, 2012 WL 3192634, at *4 (D. Vt. July 6, 2012) (finding activities including preparation of meals, doing laundry and other chores, using public transportation, shopping for groceries, walking for two miles each day, and consistently appearing appropriate and well-groomed for medical and counseling appointments, to be consistent with only mild mental limitations), *report and recommendation adopted sub nom.*, 2012 WL 3192659 (D. Vt. Aug. 6, 2012). And, as discussed above, substantial evidence supports the ALJ's finding that Plaintiff was able to do the listed activities. Specifically, Plaintiff stated in Function Reports from May and December 2015, respectively, that he was able to maintain his personal hygiene, cook his meals, do some household chores including cleaning his room every day, shop for food, pay bills, spend time with others, and get along with family, friends, and authority figures. (AR 408–13, 463–68.) Plaintiff also testified at the March 2017 administrative hearing that he could take care of his own personal

hygiene, go grocery shopping, walk his dog, and talk to friends on the phone. (AR 90–91, 96.)  Recent treatment notes even indicate, as the ALJ pointed out (AR 21), that Plaintiff was able to perform maintenance work at his apartment building in April 2017 and August 2018 (AR 1023, 1062).

In his Reply, Plaintiff argues that "historically, [medical expert] opinion[s] w[ere] given little weight in the overall evaluation of disability."  (Doc. 18 at 2 (citing *Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) (explaining that the "job" of a medical adviser is "to explain complex medical problems in terms understandable to lay examiners")).)  Though it is true that the opinions of consulting or testifying medical experts who have not examined or treated the claimant generally do not command the same deference as the opinions of examining or treating medical providers, ALJs are still required to evaluate the opinions of non-examining medical experts in consideration of the relevant regulatory factors, and it is well established that these opinions may be afforded great weight.  *See Vered v. Colvin*, No. 14-CV-4590 (KAM), 2017 WL 639245, at *14 (E.D.N.Y. Feb. 16, 2017) ("Medical experts are highly qualified professionals who are experts in the evaluation of medical issues in disability claims under the Act, and their opinion[s] may constitute substantial evidence in support of a denial of benefits, where . . . the[y] . . . [are] supported by the evidence of record."); *Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) ("factors are also to be considered with regard to non-treating sources, state agency consultants, and medical experts" (citing 20 C.F.R. § 404.1527(f))); *Florez v. Apfel*, No. CV 97-3052 (RJD), 1998 WL 760334, at *7 (E.D.N.Y. Aug. 31, 1998) ("ALJ was

free to find the non-examining expert's testimon[ial opinions] persuasive," where they were supported by the record and treating physician's opinions were not); *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record." (citing *Schisler v. Sullivan*, 3 F.3d 563, 567–68 (2d Cir. 1993))); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (ALJ entitled to accept medical expert's evaluation of claimant "in preference to" examining psychologist's opinions, where medical expert "had access to the entire medical record"); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.").  Here, the ALJ's decision to afford great weight to Dr. Claiborn's opinions is supported by several regulatory factors, particularly the fact that the opinions are consistent with the record as a whole.

### C.    G. Mark Coleman, OTR/L

Occupational therapist G. Mark Coleman, OTR/L, performed a functional capacity evaluation (FCE) on Plaintiff on February 28, 2017.  (AR 977–79.)  Therein, based on Plaintiff's test results, Coleman found that Plaintiff was functioning at a light work capacity for an eight-hour workday, and had various physical limitations including being restricted in his ability to use his hands and being able to perform postural activities like bending, kneeling, crouching, and reaching only occasionally. (*Id.*)  The ALJ gave "[p]artial weight" to Coleman's FCE, explaining that the finding

of ability to work at the light exertional level "is generally consistent with [Plaintiff's] overall mild objective medical evidence, including diagnostic testing of [his] back and lungs, as well as normal neurological exams throughout the time period under review." (AR 22.) The ALJ further found that the FCE "is consistent with [Plaintiff's] reported daily activity level, including the ability to walk his dog often, walk to appointments and to go grocery shopping, and help around the house." (*Id.*) Nonetheless, the ALJ gave little weight to the FCE's findings regarding Plaintiff's limited ability to use his hands and engage in postural activities, "as these limitations are not supported in the objective evidence of record." (*Id.*) Plaintiff contends the ALJ erred in this analysis, and should have incorporated the FCE's postural and reaching limitations into his RFC determination.

First, it must be noted that occupational therapist Coleman, like Welch, is not considered an "acceptable medical source" under the regulations, and thus his opinions are not entitled to the same level of deference as those of acceptable medical sources like licensed physicians or psychologists. *See* 20 C.F.R. §§ 404.1502(a), 404.1513(a), (d), 416.913(a), (d); SSR 06-03p, 2006 WL 2329939, at *2. Second, even if the ALJ had adopted the postural limitations contained in Coleman's FCE, Plaintiff could still perform the three "other jobs" existing in significant numbers in the national economy that the VE testified Plaintiff could perform. (*See* AR 24–25, 58.) This is because none of those "other jobs"—including the jobs of fruit distributor, marker II, and plastic hospital products assembler—requires postural maneuvers. *See* DICOT 921.685-046, 1991 WL 688088 (fruit distributor), DICOT 920.687-126,

1991 WL 687992 (marker II), DICOT 712.687-010, 1991 WL 679245 (plastic hospital products assembler).

Third and most importantly, substantial evidence, noted in the ALJ's decision (AR 22), supports the ALJ's finding that the postural and hand/reaching limitations contained in Coleman's FCE are unsupported by the record. For example, despite complaints of lumbago (lower back pain), a May 2014 treatment note described the pain as merely "mild . . . tenderness," noting Plaintiff's report that his back was hurting "when he stands up" and gave him "issues after sitting awhile."[5]  (AR 825.) In a July 2014 treatment note, Dr. Meierdiercks stated that Plaintiff reported his "main problem is that when he is lying on the sofa for a while[,] he has to use his hands to sit back up"; the Doctor questioned whether the inability to sit back up without using his hands was "because of pain," and recorded that although Plaintiff experienced "some tenderness in the para-lumbar muscles bilaterally," there was "no midline tenderness"; he was able to bend over and touch his toes; he had normal straight leg raising and knee strength; and he had intact sensation.  (AR 945–46.) Also, September 2014 imaging of Plaintiff's right shoulder and back were essentially

---

[5]  Of note, the same provider, Dr. Meierdiercks, recorded in a June 2014 treatment note that he had "filled out a form saying that [Plaintiff] would be able to work in jobs where there were not conditions that would exacerbate his COPD[,] but the family said that was not acceptable."  (AR 829.) This seems to indicate that, according to Dr. Meierdiercks, Plaintiff's COPD—and not his back pain—was his most limiting physical impairment, and even the COPD would not prevent Plaintiff from being able to work.  Nonetheless, Dr. Meierdiercks stated in the same treatment note that he was "still uncertain about the work disability issue" and suggested waiting to complete a disability form "until the next visit so we can evaluate [Plaintiff's] depression and low back pain issues."  (*Id.*)  In October 2014, another treating provider, Bert Fichman, MD, recorded in a treatment note that Plaintiff's back was "tender to palpation" but he "d[id] not have tenderness over his SI joint region."  (AR 873.)  Dr. Fichman recommended that Plaintiff stop smoking, try physical therapy, and lose weight "since [his weight gain of approximately 25–30 pounds] might be contributing to his back pain."  (*Id.*)

normal (AR 872, 879, 881–82, 935–36, 946, 954); and a September 2014 treatment note indicated that Plaintiff was having right shoulder pain which was "[l]ikely tendinitis," and Plaintiff was instructed to take Naprosyn and "follow[] up with his doctor to discuss physical therapy if [he experienced] ongoing symptoms" (AR 880). In treatment notes from October 2014, November 2014, and March 2015, it was recorded that Plaintiff had no complaints other than COPD-related issues including a dry mouth upon waking.  (AR 901, 903, 905.)  An October 2015 consultation report states that Plaintiff reported he "[wa]s not working . . . due to shortness of breath and difficulty breathing," not due to back or shoulder pain (AR 925); and indicates that Plaintiff experienced only "[m]ild tenderness" in his mid-lower back, and could rotate his shoulders and reach over his head, had full 5/5 motor strength and intact sensation in his upper extremities, had no limitation in his shoulder range of motion, and had 5/5 grip strength on both the right and left (AR 927–28).  A treatment note from October 2015 states that back MRIs and xrays were normal, and "[t]he back specialist wanted [Plaintiff] to stop smoking, lose some weight[,] and go to Physical Therapy," none of which he had done.  (AR 935.)  A July 2016 treatment note indicates that Plaintiff reported he "does not feel like he needs to go to physical therapy."  (AR 973; *see also* AR 872 ("has not done Physical Therapy").)  In addition, the record reveals that Plaintiff did not report shoulder pain or hand/reaching limitations when completing function reports, testifying at the administrative hearing, or presenting for physical therapy evaluations.  (*See, e.g.*, AR 412, 467, 1023.)  Accordingly, the Court finds no error in the ALJ's evaluation of Coleman's

FCE findings.

## II.    ALJ's RFC Determination / Past Relevant Work

Plaintiff's argument that the ALJ erred in his RFC determination and in his step-four finding that Plaintiff could do his past relevant work largely relies on his contention that the ALJ erred in his analysis of the opinions of counselor Welch, Dr. Claiborn, and therapist Coleman.  The argument thus fails, given the above conclusion that the ALJ did not err in his analysis of those opinions.  Plaintiff appears to be asking the Court to reweigh the evidence in assessing the ALJ's RFC determination.  But, as the Commissioner points out, "[i]t is for the [Social Security Administration], and not this court, to weigh the conflicting evidence in the record." *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998); *see Alston*, 904 F.2d at 126.  And the ALJ's decision will be set aside "only if the factual findings [contained therein] are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citation and internal quotation marks omitted).  As discussed herein, Plaintiff has pointed to no legal error in the ALJ's decision, leaving only the issue of whether the decision is supported by substantial evidence.  *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) (holding that courts are bound to uphold ALJ decisions to deny disability applications, "so long as they are supported by 'substantial evidence'" (quoting 42 U.S.C. § 405(g))); *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) ("If there is substantial evidence to support the determination, it must be upheld.").  The Supreme Court recently discussed the "substantial evidence" standard:

>The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding.  Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations.  And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is "more than a mere scintilla."  It means—and means only—"*such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.*"

*Biestek*, 139 S. Ct. at 1154 (alteration in original) (emphasis added) (citations omitted); *see Brault*, 683 F.3d at 448 ("very deferential standard of review—even more so than the 'clearly erroneous' standard").  Here, the ALJ's decision is detailed and thorough, citing many specific records to support the findings contained therein.  The decision easily clears the "substantial evidence" standard of "more than a mere scintilla."  *Id.*

The regulations provide that a claimant's RFC is "the most [he] can still do despite [his] limitations," and that the ALJ will assess a claimant's RFC "based on all the relevant evidence in [the] case record."  20 C.F.R. § 404.1545(a)(1).  "In general," it is the claimant and not the ALJ who is "responsible for providing the evidence . . . use[d] to make a finding about [his] [RFC]."  *Id.* § 404.1545(a)(3); *see id.* § 404.1512(a)(1) ("You must inform us about or submit all evidence known to you that relates to whether or not you are . . . disabled."); *Butts*, 388 F.3d at 383 (claimant bears burden of proving case at steps one through four).  Similarly, "the claimant has the burden [at step four of the sequential evaluation] to show an inability to return to h[is] previous specific job *and* an inability to perform h[is] past relevant work generally."  *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003).  Plaintiff has

shown no deficiencies in either the ALJ's RFC determination (AR 16–17) or his step-four finding that Plaintiff could return to his past relevant work as a machine operator helper (AR 23–24).

## III.   ALJ's Step-Five Finding that Plaintiff Could Do Other Work

Finally, Plaintiff argues that the ALJ erred in finding that, as an alternative to doing his past relevant work, Plaintiff could do other work existing in significant numbers in the national economy, including the jobs of fruit distributor, marker, and plastic hospital products assembler.  (AR 24–25.)  Plaintiff's argument relies on his contention that the ALJ erred in his RFC determination and his step-four finding that Plaintiff could return to his past relevant work, which relies on Plaintiff's claim that the ALJ erred in his analysis of the medical opinions.  (*See* Doc. 14 at 16.) Again, given the conclusion that the ALJ did not so err, Plaintiff's argument fails.

As noted above, at step five of the ALJ's sequential evaluation process, there is a limited burden shift to the Commissioner to demonstrate that a significant number of jobs exist in the national economy that the claimant can perform.  *Poupore*, 566 F.3d at 306; *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1520(g).  The Commissioner may meet this burden by relying on the testimony of a VE at the administrative hearing in response to a hypothetical question asking whether a person with the claimant's RFC, age, education, and work experience would be able to perform other work existing in the national economy.  *Butts*, 388 F.3d at 384; *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983) (VE's opinion, properly based on claimant's skills and limitations, satisfies Commissioner's

burden to show existence of other work that claimant can perform).  The rulings and regulations of the Social Security Administration anticipate that the testimony of a VE will be consistent with information supplied in the Department of Labor's Dictionary of Occupational Titles (DOT).  *Richardson v. Soc. Sec. Admin.*, 1:10-cv-00313-JAW, 2011 WL 3273140, at *11 (D. Me. July 29, 2011); SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000) (noting that the Commissioner has a policy of relying primarily on the DOT to classify the various characteristics of occupations).  Here, in finding at step five that Plaintiff could perform other work existing in significant numbers in the national economy, the ALJ properly relied on the VE's testimony at the second administrative hearing that a hypothetical person possessing the limitations included in the ALJ's RFC determination for Plaintiff, would be able to perform "three other jobs," including the jobs of fruit distributor, marker II, and plastic hospital products assembler.  (*See* AR 24–25, 58.)  The VE explicitly testified that his testimony about these "other jobs" was "consistent with the DOT."  (AR 58.)

Plaintiff's step-five claim relies on the VE's testimony in response to hypothetical questions regarding a claimant who possessed more limitations than the ALJ found Plaintiff had during the relevant period.[6]  (*See* Doc. 16 at 14–15; AR 59–60.)  But the ALJ is not bound to accept VE testimony which is given in response to hypothetical questions that include restrictions not applicable to the claimant; and

---

[6] For example, the VE testified that, if a limitation of being off task for up to 15% of the day due to mental health symptoms was added to the ALJ's initial hypothetical, "there would be no jobs"; and that, if a limitation of  being able to do only sedentary work was added, "[a]ll past relevant work would be precluded."  (AR 59.)

testimony from a VE "is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job." *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).  Here, the initial hypothetical claimant presented by the ALJ to the VE includes the limitations contained in the ALJ's RFC determination for Plaintiff (*see* AR 57, describing a hypothetical individual who could do only light work with the following additional limitations: no more than frequent climbing of stairs and ramps; no more than occasional exposure to dusts, odors, fumes, and other pulmonary irritants; no more than frequent exposure to extreme cold; no more than frequent hearing; able to perform only simple, routine tasks; able to handle only occasional changes in the work setting; and able to interact with the public only less than occasionally),[7] and the Court has found that this RFC determination is supported by substantial evidence.  It was therefore proper for the ALJ to rely on the VE's testimony in response to this hypothetical, stating that jobs existed in significant numbers in the national economy that Plaintiff could perform.  *See Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("Because we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] [VE] challenge."); *Diakogiannis v. Astrue*,

---

[7] There is a slight difference between the RFC determination contained in the ALJ's decision and the hypothetical on which the VE relied at the second administrative hearing in support of the finding that Plaintiff could do his past relevant work and other work existing in significant numbers in the national economy.  (*Compare* AR 16 *and* AR 57.)  Specifically, the ALJ's RFC determination contains a limitation to "*frequent* exposure to dust, odors, fumes[,] and pulmonary irritants" (AR 16 (emphasis added)); whereas the VE's hypothetical includes a limitation to "no more than *occasional*" exposure to "dusts, odors, fumes, and other pulmonary irritants" (AR 57 (emphasis added)).  This discrepancy does not call into question the ALJ's decision, however, as the VE testified that a hypothetical claimant who was *more limited* than the ALJ determined Plaintiff was, could nonetheless perform Plaintiff's past relevant work and other work existing in significant numbers in the national economy.  Thus the discrepancy caused no prejudice to Plaintiff.

975 F. Supp. 2d 299, 319 (W.D.N.Y. 2013) ("Having determined that substantial evidence supports the ALJ's RFC determination, [plaintiff's] argument [that the ALJ erred in relying on the VE because the hypothetical posed to the VE was based upon a flawed RFC assessment] is rejected.").

In support of the claim that the ALJ erred at step five, Plaintiff points to VE Soldner's testimony at the second administrative hearing that "[a]ll jobs would be precluded" for a hypothetical claimant who would be expected to miss "greater than or equal to two days per month on a sustained basis." (AR 60.) (*See* Doc. 16 at 15.) Indeed, the VE did so testify. Yet he also testified to the contrary, stating that, "[t]ypically one or two absences per month is *tolerated*." (AR 60 (emphasis added).) The VE clearly contradicted himself here, stating that missing two days per month of work is both "precluded" and "tolerated." (*Id.*) Perhaps the issue may be resolved by looking to the testimony of VE Spaulding at the initial administrative hearing: she stated that an individual who missed "at least two days of work on an ongoing basis" would *not* be able to perform any job. (AR 106.) But the Court need not determine the issue, as the apparent contradictory testimony of VE Soldner is of no import, because the ALJ did not include as part of his RFC determination the limitation that Plaintiff would miss two or more days of work each month and, as discussed above, the ALJ made no error in his RFC determination and it is supported by substantial evidence.

## <u>Conclusion</u>

For these reasons, the Court DENIES Plaintiff's motion (Doc. 16), GRANTS the Commissioner's motion (Doc. 17), and AFFIRMS the decision of the Commissioner.  The Clerk shall enter judgment in favor of the Commissioner.


Dated at Burlington, in the District of Vermont, this 16th day of October 2020.

<div style="margin-left: 50%;">

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

</div>